**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| HILDA P. GARCIA, | No. CV 11-8630-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on October 24, 2011, seeking review of the Commissioner's denial of her applications for Disability Insurance Benefits and Supplemental Security Income payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on November 18, 2011, and December 16, 2011.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on July 2, 2012, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on May 6, 1955. [Administrative Record ("AR") at 43.] She has a sixth grade education[1] [AR at 121], and past relevant work experience as a parking lot attendant, janitor, cashier, stock clerk, and retail clerk.[2] [AR at 39-40, 118, 143.]

On July 16, 2008, plaintiff filed an application for Disability Insurance Benefits and protectively filed an application for Supplemental Security Income payments, alleging that she has been unable to work since May 17, 2007, due to anxiety, problems with her spinal cord, and problems with her neck. [AR at 43-46, 116-22.] After her applications were denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 47-58, 61.] A hearing was held on January 27, 2010, at which time plaintiff appeared with counsel and testified on her own behalf. [AR at 24-42.] A medical expert and a vocational expert also testified. [AR at 35-41.] On February 5, 2010, the ALJ determined that plaintiff was not disabled. [AR at 12-19.] On August 25, 2011, the Appeals Council denied plaintiff's request for review. [AR at 1-5, 8.] This action followed.

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

---

[1] Plaintiff stated in a Disability Report that the highest grade of school she has completed is the sixth grade, but her attorney represented at plaintiff's hearing before the Administrative Law Judge that she "has a ninth grade education achieved in Mexico." [AR at 27, 121.]

[2] A vocational expert testified at plaintiff's hearing before the Administrative Law Judge that plaintiff has past relevant work as a parking lot attendant, janitor, cashier, stock clerk, and retail clerk, and plaintiff's attorney stated that she "believe[d] that's all correct." [AR at 39-40.]

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.  THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or

equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since May 17, 2007, her alleged disability onset date. [AR at 14.][3] At step two, the ALJ concluded that plaintiff has the severe impairments of low back pain, shoulder pain, and neck pain. [Id.] At step three, the ALJ determined that plaintiff's impairments do not meet or equal any of the impairments in the Listing. [AR at 15.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[4] to perform less than the full range of "light work" as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b).[5] Specifically, the ALJ found that plaintiff "can lift [or]

---

[3]   The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2012. [AR at 14.]

[4]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[5]   20 C.F.R. §§ 404.1567(b), 416.967(b) define "light work" as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."

carry 20 pounds occasionally and 10 pounds frequently[,] ... stand [or] walk 6 hours and sit 6 hours in an 8-hour workday, with normal breaks," and "[p]ush[] and pull[] ... limited only by weight limits," but that she "cannot crawl." [Id.] At step four, the ALJ concluded that plaintiff is capable of performing her past relevant work as a parking lot attendant, a retail clerk, and a cashier. [AR at 18.] Accordingly, the ALJ determined that plaintiff has not been disabled at any time from May 17, 2007, through February 5, 2010, the date of the decision. [AR at 18-19.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ improperly: (1) evaluated the opinions of plaintiff's treating and examining physicians, and (2) discounted plaintiff's credibility. [Joint Stipulation ("JS") at 4-7, 10-17, 20-21.] As set forth below, the Court agrees with plaintiff and remands the matter for further proceedings.

**A.   TREATING PHYSICIAN AND EXAMINING PHYSICIAN OPINIONS**

Plaintiff contends that the ALJ improperly rejected the opinions of plaintiff's treating physician and an examining physician. [JS at 4-7, 10-12.]

In evaluating medical opinions, the case law and regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). See 20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927; see also Lester, 81 F.3d at 830. Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

Where a treating physician's opinion does not contradict other medical evidence, the ALJ must provide clear and convincing reasons to discount it. Lester, 81 F.3d at 830; see also Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). Where a treating physician's opinion

conflicts with other medical evidence, the ALJ must set forth specific and legitimate reasons supported by substantial evidence in the record to reject it. Lester, 81 F.3d at 830; see also McAllister v. Sullivan, 888 F.2d 599, 602-03 (9th Cir. 1989). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830. As is the case with the opinion of a treating physician, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons supported by substantial evidence in the record to reject the contradicted opinion of an examining physician. See id. at 830-31. The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ "must set forth his own interpretations and explain why they, rather than the [treating] doctors', are correct." Id.

      Dr. Dennis Ainbinder, an orthopedic surgeon, examined plaintiff on November 18, 2008. [AR at 262-89.] Dr. Ainbinder performed examinations of plaintiff's cervical spine and lumbosacral spine and examined MRIs of her cervical spine and lumbar spine. [AR at 266-70.] Dr. Ainbinder diagnosed plaintiff with multiple disc protrusions from L3 to S1; 1-2 mm disc bulges at C4-C5, C5-C6, and C6-C7 with moderate right neural foraminal narrowing at C4-C5 and mild right neural foraminal narrowing at C6-C7; right carpal tunnel syndrome; bilateral sciatica; and right brachialgia. [AR at 284-85.] In his discussion, Dr. Ainbinder stated that plaintiff had "a negative Tinel sign over the carpal canal as well as a negative Phalen sign," but also stated that "current diagnostic studies of [plaintiff's] cervical and lumbar spine do reveal right carpal tunnel syndrome," and that plaintiff "does have evidence of right carpal tunnel syndrome that was detected on the neurological studies." [AR at 286.] On September 22, 2009, Dr. Ainbinder performed a range of motion analysis of plaintiff's lumbosacral region and assigned her "[t]otal [s]pine/[p]elvis [i]mpairment" of 18 percent, as well as a "[w]hole [p]erson [i]mpairment" of 18 percent. [AR at 331-33.] Finally, Dr. Ainbinder examined plaintiff again on October 21, 2009. [AR at 311-30.] Upon performing a cervical spine examination, he found that plaintiff had "tenderness to the midline, paravertebral muscles on the right side[,] and trapezial muscles on the right side," "pain on

1 terminal left bend and left rotation," and "[p]er the AMA Guides, ... Grade IV diminished sensation
2 to the right long finger."  [AR at 315.]  Based on a lumbosacral spine examination, Dr. Ainbinder
3 found that there was "tenderness to the midline, left posterior superior iliac spine[,] and left
4 sacroiliac joint," as well as "Grade IV diminished sensation to the back of the left leg and left calf
5 to the sole of the left foot."  [AR at 316-17.]  Dr. Ainbinder stated that seven views of x-rays of
6 plaintiff's cervical spine "reveal degenerative changes at C4-C5 and C5-C6," and that an October
7 7, 2009, MRI of plaintiff's lumbar spine "reveals a 4 mm right foraminal disc protrusion at L4-L5
8 with abutment against the exiting right L4 nerve root."  [AR at 318.]  His report also noted that
9 "[e]lectrodiagnostic evidence of carpal tunnel syndrome" in plaintiff's right wrist was 2 percent. [AR
10 at 325.]  His diagnoses for plaintiff were consistent with the diagnoses he rendered on November
11 18, 2008, except for the following: persistent left sciatica; right brachialgia, resolved; and "updated
12 MRI of lumbar spine, October 7, 2009, compatible with 4 mm right foraminal disc protrusion at L4-
13 L5 with contact of the exiting right L4 nerve root."  [AR at 322-23.]  For plaintiff's sciatica, Dr.
14 Ainbinder recommended that she receive an epidural injection in her lumbar spine, followed by
15 two more if the first one "help[ed]."  [See AR at 323-24.]  He opined that plaintiff's work restrictions
16 would "preclud[e] heavy work, prolonged walking[,] and prolonged sitting until she return[ed] ...
17 subsequent to the epidural injections," and that if plaintiff decided against his recommended
18 epidural injections, she would "be considered as having reached Maximum Medical Improvement
19 as of [that date]" with regard to her lumbar spine.  [See AR at 324.]  He further opined that plaintiff
20 is precluded from "repetitive motions of the neck," but that "[n]o work restrictions are necessary
21 for the right wrist," and that she had also "reached maximum medical improvement" with regard
22 to her cervical spine and right wrist as of that date.  [AR at 324, 326.]

23       The record reflects that Dr. Vincent Gumbs saw plaintiff four times between August 2009,
24 and January 2010.  [See AR at 306, 308, 310, 354-61, 374-78.]  On August 25, 2009, Dr. Gumbs
25 performed an initial orthopedic evaluation of plaintiff.  [AR at 354-61.]  He physically examined
26 plaintiff and made the following findings: "she [was] tender from C4-C7 spinous process"; there
27 was "tenderness in the bilateral trapezius muscles and the medial border of both scapulae"; "she
28 [was] exquisitely tender on deep palpation in the upper thoracic spine area"; she had decreased

7

range of motion and "decreased internal and external rotation to about 40 degrees each" in both shoulders; her right shoulder was tender over the biceps tendon and subacromial space; she had "significantly decreased range of motion" in her dorsolumbosacral spine; she was tender over L4-L5, L5-S1, and over the paradorsal muscles from T12-S1; and she had painful extension and flexion in both knees. [AR at 358-59.] Dr. Gumbs stated in his report that "MRIs were not obtained today," but diagnosed plaintiff with cervical strain and sprain, dorsolumbosacral musculoligamentous strain and sprain, possible right shoulder impingement syndrome, and positive degenerative arthritis in both knees. [AR at 359.] As to both plaintiff's cervical strain and her dorsolumbosacral musculoligamentous strain, Dr. Gumbs noted, "rule out herniated disc." [Id.] In a treatment note dated the same day, Dr. Gumbs diagnosed plaintiff with degenerative disease in both knees, back pain and/or trauma in the lumbar spine, and neck pain and/or spasms. [AR at 310.] He requested to view MRIs of plaintiff's lumbar spine, cervical spine, and right shoulder, and prescribed her with Motrin, Darvocet, and Prilosec. [Id.] On November 3, 2009, Dr. Gumbs saw plaintiff again and found on examination that she was tender over the neck, lumbar spine, and both trapezius muscles. [AR at 308.] He diagnosed her with right shoulder impingement and "sprain/strain" in the cervical spine and lumbar spine, and also ordered refills of Motrin, Darvocet, and Prilosec. [Id.] On December 1, 2009, Dr. Gumbs examined plaintiff again and found tenderness and decreased range of motion in her lumbar spine, as well as tenderness over her neck at C6-C7. [AR at 306.] His diagnoses for plaintiff were the same as those on November 3, 2009, and he directed plaintiff to continue taking her medications. [Id.] Dr. Gumbs saw plaintiff again on January 15, 2010, and made findings consistent with those in his earlier reports. [AR at 374-78.] He diagnosed plaintiff with cervical strain and sprain, dorsal lumbosacral musculoligamentous strain and sprain of the right shoulder, positive impingement syndrome, positive degenerative changes in her knees, and possible carpal tunnel syndrome. [AR at 376.] He also reviewed Dr. Ainbinder's medical records for plaintiff and stated that he "concur[red] with [Dr. Ainbinder's] findings for [plaintiff] with a total of whole person impairment of 18%," noted that Dr. Ainbinder had made conclusions concerning plaintiff's work restrictions, stated that he

1  "defer[red] [his own] findings to [those of] Dr. Einbinder [sic]," and reported that "[i]n [his] opinion, [plaintiff] [was] permanent and stationary." [AR at 377.]

The ALJ did not explicitly assign any weight to Dr. Ainbinder's opinions [see AR at 15-18], but merely stated that the medical expert's opinions concerning plaintiff's RFC were "generally consistent with the work restriction[s] in Dr. Ainbinder's evaluation indicating that [plaintiff] was precluded from heavy work, and prolonged walking/standing." [AR at 17.] As to Dr. Gumbs, the ALJ assigned less weight to his opinions than to the medical expert's opinions, stating that while a letter from Dr. Gumbs[6] found that plaintiff can lift or carry 5 pounds from the floor, 10 pounds from the waist, and 15 pounds occasionally, and that plaintiff would have difficulty sitting and standing continuously, the medical expert "opined that [plaintiff's] records did not support such restrictive limitations." [Id.] "Namely," the ALJ stated, "[plaintiff] had no herniated disc, no severe arthritic changes, ... was diagnosed merely with sprains and strains[,] [and] there were no medical records to support carpal tunnel syndrome." [Id.] The ALJ also stated that "[l]ess weight is given to the opinions of [plaintiff's] treating/examining physicians to the extent they find [plaintiff] to be temporarily or permanently disabled." [Id.]

First, as to Dr. Ainbinder, the Court finds that substantial evidence does not support the ALJ's conclusion that the medical expert's opinion that plaintiff can stand or walk for 6 hours in an 8-hour workday [see AR at 17, 38] is "generally consistent" with Dr. Ainbinder's opinion that plaintiff is precluded from "prolonged" walking and standing. See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994) (stating that "though the term 'prolonged walking' is admittedly vague, we believe any job requiring a person to be on his or her feet seventy-five percent of the time inevitably requires such exertion"); see also Smith-Scruggs v. Astrue, 2010 WL 256546, at *6 n.8

---

[6] The ALJ stated at the hearing that Dr. Gumbs provided an RFC assessment "at the back of" one of his letters that "indicates that [plaintiff] can comfortably lift and carry up to five pounds ... from the floor, ... 10 pounds ... from the waist[,] and occasionally 15 pounds[;] and that she has difficulty sitting and standing continuously." [AR at 37.] The ALJ did not identify which of Dr. Gumbs' letters and which RFC assessment in the record he was referring to [see id.], and the two RFC evaluations in the record associated with Dr. Gumbs appear to have been performed by a chiropractor in his office. [See AR at 341-53, 379-91.] Since the ALJ treated the RFC evaluation he referenced as belonging to Dr. Gumbs [see AR at 17, 37], the Court does the same.

9

1  (C.D. Cal. Jan. 21, 2010) (citing Hajek for the proposition that "prolonged walking" is "equivalent
2  to about six hours of an eight-hour workday"). Thus, the ALJ erred by finding that Dr. Ainbinder's
3  opinion and the medical expert's opinion on this issue were not in conflict.

4  Dr. Ainbinder examined plaintiff on November 18, 2008, September 22, 2009, and October
5  21, 2009. As an examining physician, his opinion was entitled to greater weight than the opinion
6  of a nonexamining physician. See Lester, 81 F.3d at 830. Here, as the Court finds that Dr.
7  Ainbinder and the medical expert gave conflicting opinions regarding plaintiff's ability to stand and
8  walk, the ALJ erred insofar as he rejected Dr. Ainbinder's opinion in favor of the medical expert's
9  opinion. A nonexamining physician's opinion with nothing more cannot constitute substantial
10 evidence to support the ALJ's rejection of Dr. Ainbinder's opinion. See Morgan v. Comm'r of Soc.
11 Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) ("The opinion of a nonexamining medical advisor
12 cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an
13 examining or treating physician."). Thus, the ALJ was required to give specific and legitimate
14 reasons supported by substantial evidence in the record to reject Dr. Ainbinder's opinions. See
15 Lester, 81 F.3d at 830-31. However, the ALJ did not clearly provide any reasons to reject Dr.
16 Ainbinder's opinions.

17 In reviewing the ALJ's decision, the Court notes that the ALJ may have rejected Dr.
18 Ainbinder's opinions to the extent that the ALJ found the doctor opined that plaintiff is "temporarily
19 or permanently disabled." [AR at 17.] The ALJ stated in his decision that "[l]ess weight is given
20 to the opinions of [plaintiff's] treating/examining physicians to the extent they find [plaintiff] to be
21 temporarily or permanently disabled," although he did not specifically identify Dr. Ainbinder as one
22 of the physicians who rendered such an opinion. [See id.] The ALJ correctly stated that the
23 determination of a claimant's ultimate disability is reserved to the Commissioner. See 20 C.F.R.
24 §§ 404.1527(e)(1), 416.927(e)(1). Even so, to the extent the ALJ believed that Dr. Ainbinder --
25 by assigning plaintiff a "[w]hole [p]erson [i]mpairment" and a "[t]otal [s]pine/[p]elvis [i]mpairment"
26 of 18 percent -- rendered an opinion on the ultimate issue of whether plaintiff is disabled, the ALJ
27 was still required to give specific and legitimate reasons to reject that opinion. See McAllister, 888
28 F.2d at 602-03 (remand warranted where ALJ failed to give adequately specific and legitimate

10

reasons for disregarding treating physician's testimony that the claimant was disabled due to personality disorder). The ALJ did not, which was error.

Second, as to Dr. Gumbs -- plaintiff's treating physician from August 2009 to January 2010 -- even if his opinions regarding plaintiff's work restrictions conflicted with the medical expert's opinions on the same issue [see AR at 17], the ALJ was still required to set forth specific and legitimate reasons supported by substantial evidence in the record to reject his opinions. See Lester, 81 F.3d at 830. The ALJ failed to do so.

In assigning less weight to Dr. Gumbs' opinions, the ALJ first relied on the medical expert's testimony concerning the objective evidence in the record, and appeared to adopt the opinion in that testimony as his own. [See AR at 17, 38.] The conclusion that Dr. Gumbs' opinions were not supported by the objective evidence is not wholly accurate, however. It is improper to reject a treating physician's opinion where he provided at least some objective observations and testing in addition to subjective opinions. See Embrey, 849 F.2d at 421; see also 20 C.F.R. §§ 404.1527, 416.927 (the proper weight that an ALJ should give to a treating physician's opinion depends on whether sufficient data supports the opinion and whether the opinion comports with other evidence in the record); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (when the treating physician diagnosed the claimant with depression, set forth clinical observations supporting the diagnosis, and prescribed psychotherapeutic drugs, the ALJ erred in finding that the claimant had not set forth sufficient evidence to substantiate the mental impairment). Here, Dr. Gumbs examined plaintiff on August 25, 2009, and found that plaintiff was "exquisitely tender on deep palpation in the upper thoracic spine area," and tender "from C4-C7 spinous process," over L4-L5, L5-S1, over the paradorsal muscles from T12-S1, "in the bilateral trapezius muscles and the medial border of both scapulae," and over the biceps tendon and subacromial space in her right shoulder. [AR at 358-59.] Dr. Gumbs also found that plaintiff had "significantly decreased range of motion" in her dorsolumbosacral spine and diagnosed her with strain and sprain in her cervical spine and dorsolumbosacral spine. [AR at 358-59.] Thus, his findings support his opinions that plaintiff has difficulty lifting and carrying items. Moreover, the ALJ stated that plaintiff "had ... no severe arthritic changes," but on August 25, 2009, Dr. Gumbs found that plaintiff had painful

1  extension and flexion in both knees and diagnosed her with positive degenerative arthritis of both
2  knees [AR at 359], and on January 15, 2010, he again diagnosed her with positive degenerative
3  changes of both knees. [AR at 376.] Finally, while Dr. Gumbs did not opine that plaintiff has any
4  work restrictions based on carpal tunnel syndrome [see AR at 326], contrary to the ALJ's
5  conclusion, there were in fact "medical records to support [a diagnosis of] carpal tunnel syndrome."
6  [See AR at 17.] Dr. Ainbinder noted on November 18, 2008, that "current diagnostic studies of
7  [plaintiff's] cervical and lumbar spine do reveal right carpal tunnel syndrome," and that neurological
8  studies detected "evidence of right carpal tunnel syndrome" [AR at 286], and on October 21, 2009,
9  that "electrodiagnostic evidence of carpal tunnel syndrome" in plaintiff's right wrist was 2 percent.
10  [AR at 325.]

11  Next, to the extent the ALJ rejected Dr. Gumbs' opinions on the ground that Dr. Gumbs
12  opined that plaintiff is "temporarily or permanently disabled" [AR at 21] in that plaintiff has a "total
13  of whole person impairment of 18%" and "is permanent and stationary" [AR at 377], that rejection
14  was improper for the reasons discussed supra. See also McAllister, 888 F.2d at 602-03.

15  The ALJ did not properly reject Dr. Ainbinder's and Dr. Gumbs' opinions. Accordingly,
16  remand is warranted on this issue.

**B.  PLAINTIFF'S SUBJECTIVE SYMPTOM TESTIMONY**

Plaintiff contends that the ALJ failed to properly evaluate her subjective symptom testimony. [JS at 13-17, 20-21.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if the claimant meets the first test, the ALJ may only reject the claimant's testimony about the severity of her symptoms upon (1) finding evidence affirmatively suggesting that the claimant was malingering, or (2) offering specific, clear and convincing reasons

1  for doing so. See Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1999); see also Lingenfelter, 504
2  F.3d at 1036; Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003). The factors to be
3  considered in weighing a claimant's credibility include: (1) the claimant's reputation for
4  truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's
5  testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and
6  (5) testimony from physicians and third parties concerning the nature, severity, and effect of the
7  symptoms of which the claimant complains. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th
8  Cir. 2002); see also 20 C.F.R. §§ 404.1529(c), 416.929(c). If properly supported, the ALJ's
9  credibility determination is entitled to "great deference." See Green v. Heckler, 803 F.2d 528, 532
10 (9th Cir. 1986).

In a Function Report plaintiff completed on August 3, 2008, plaintiff stated that her impairments affected her ability to care for herself in that she "can[]not take tub without help from brother," "can[]not shave [her] legs under [her] knees," and "can[]not bend down" to dress herself. [AR at 134-41.] Plaintiff also stated that she cannot stand, sit, or sleep "too long," and that she "can[]not lay in bed too long because [she] feel[s] body aches." [AR at 135, 138.] She reported that she walks with a cane, uses a "walker when [her] back gives [out]," can only walk 15 minutes before needing to rest for 5 to 10 minutes, and "can[]not run[,] squat[], or kneel like [she] did before." [AR at 139-40.] Plaintiff represented that she only prepares "easy food" that takes her a few minutes to microwave, and that others help her with mopping, sweeping, and yard work because such activities are too heavy or painful for her to perform. [AR at 136-38.] With regard to driving, plaintiff stated that she can only "drive close by," and that when she needs to go "far away," she asks her family to take her. [See AR at 137.] Plaintiff also stated that she goes shopping with a friend, and that she can only shop for things such as eggs, fruit, and instant food, whereas she avoids carrying heavy items such as milk, bleach, or soap. [AR at 137-38.] Finally, plaintiff reported that with regard to social activities, she visits her mom once a week, attends church on Sundays only, and has "lost many friends because [she] can no longer go out and party with them because of [her] illness." [AR at 138-39.]

At her January 27, 2010, hearing before the ALJ, plaintiff testified that when she is taking her medications, her pain is a 6 or 7 on a scale of 1 to 10. [AR at 31.] Plaintiff testified that at the time of the hearing, she could carry less than 5 pounds, could only walk 1 or 2 blocks before needing to rest, and could stand on her feet for "maybe half an hour." [See id.] She further testified that she uses a cane, which was prescribed by her first doctor, as well as a back brace. [AR at 31-32.] Plaintiff represented that she eats "easy" food because she lives by herself, and that she does not sweep, vacuum, or dust, but that her friend sometimes comes to clean her house. [See AR at 32-33.] Plaintiff also stated that her nephew who lives next door takes her to the market, and that she "don't [sic] drive that much," but "just [drives when she] go[es] [to her] doctor, when [she] don't got [sic] somebody with [her]." [Id.] Finally, plaintiff testified that her doctor told her that "the only thing maybe that can help [her] is [to] get [an] operation." [AR at 33.]

At step one of the two-step credibility analysis, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." [AR at 16.] The ALJ nevertheless concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's RFC findings for plaintiff]." [Id.] Thus, at step two, as the record contains no evidence of malingering by plaintiff,[7] the ALJ was required to offer "specific, clear and convincing reasons" for rejecting her subjective symptom testimony. See Lingenfelter, 504 F.3d at 1036. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Reddick, 157 F.3d at 722 (quoting Lester, 81 F.3d at 834); see also Dodrill, 12 F.3d at 918.

The ALJ rejected plaintiff's credibility because: (1) "there is no evidence establishing the impairments are so severe as to prevent [plaintiff] from basic work abilities"; (2) plaintiff "has received relatively mild and conservative treatment [for her neck pain and back pain]"; and (3)

---

[7] The ALJ made no finding that plaintiff was malingering, nor does the evidence suggest plaintiff was doing so.

14

plaintiff's "activities of daily living are inconsistent with her claims of limitations and restrictions." [See AR at 16, 18.]

The ALJ's first reason for discounting plaintiff's credibility was improper. The ALJ merely stated that "there is no evidence establishing the impairments are so severe as to prevent [plaintiff] from basic work abilities," without explaining *what* basic work abilities are not precluded by plaintiff's statements regarding her limitations. Thus, this reason to reject plaintiff's credibility was not sufficiently specific. See Lingenfelter, 504 F.3d at 1036; Dodrill, 12 F.3d at 918. Moreover, as discussed supra, the ALJ's treatment of Dr. Ainbinder's and Dr. Gumbs' opinions regarding plaintiff's work restrictions was inadequate. Finally, while an ALJ may consider whether a lack of objective medical evidence supports the degree of limitation, this "cannot form the sole basis for discounting pain testimony." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005). "The rationale for this restriction is that pain testimony may establish greater limitations than can medical evidence alone." Id. at 680 (citing Social Security Ruling[8] 96-7p). Thus, even if the ALJ's characterization of the medical evidence was supported by substantial evidence, the ALJ would only be able to rely upon this rationale if his other reasons for discounting plaintiff's credibility are proper. However, neither of the ALJ's other reasons for discounting plaintiff's credibility is legally adequate.

The ALJ's second ground for rejecting plaintiff's credibility was that plaintiff "has received relatively mild and conservative treatment [for her neck pain and back pain]." [AR at 16.] However, the record reflects that Dr. Gumbs prescribed plaintiff with Darvocet [see AR at 308, 310], and that her previous physician, Dr. Archie R. Mays (who treated plaintiff from May 2007 until as late as August 2009), prescribed her with Norco. [See AR at 194-99, 201-05.] Both of these drugs contain narcotics.[9] Moreover, plaintiff received epidural injections at L4-L5 and L5-S1

---

[8] Social Security Rulings do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

[9] Darvocet contains propoxyphene, which is "in a group of drugs called narcotic pain
(continued...)

on both June 1, 2009, and August 3, 2009 [see AR at 320-21], which she affirmed at the hearing before the ALJ "didn't help [her] for long." [See AR at 32.] The ALJ pointed to nothing in the record to show that any specific treatment in addition to the treatment plaintiff was receiving is a standard method of treating neck and back pain. [See AR at 16-18.] Finally, insofar as the ALJ concluded that plaintiff's treatment for her neck and back pain has been "mild and conservative" because she has not pursued spinal surgery, "it is improper to deny benefits on the basis of declined surgery, when surgery is only a suggested rather than a prescribed course of treatment." Aguirre v. Astrue, 2009 WL 3346741, at *5 (C.D. Cal. Oct. 14, 2009); Cooley v. Astrue, 2011 WL 2554222, at *4 n.3 (C.D. Cal. June 27, 2011) (quoting Aguirre); see also Teter v. Heckler, 775 F.2d 1104, 1107 (10th Cir. 1985) (claimant's refusal to undergo surgical treatment is not a sufficient reason to deny benefits where surgery was at most recommended or suggested but not prescribed by a physician). Indeed, the record reflects that Dr. Mays referred plaintiff to a spine surgeon for a consultation on August 5, 2009 [see AR at 303], but the Court is not aware of any evidence that any of plaintiff's doctors prescribed spinal surgery as treatment for her neck and back pain.

Finally, the ALJ also found plaintiff incredible because he found that plaintiff's daily activities "are inconsistent with her claims of limitations and restrictions." [AR at 18.] Generally speaking, if a claimant has the ability to perform activities "that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent [her] from working." See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Engaging in some household chores or activities, however, is not necessarily inconsistent with a finding of disability. See Gallant, 753 F.2d at 1453 (benefits awarded on appeal to a claimant experiencing constant leg and back pain, despite the claimant's ability to cook and wash dishes); see also Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987) (stating that the ability to assist with

---

[9](...continued)
relievers." http://www.drugs.com/darvocet.html. Norco contains hydrocone, which "is in a group of drugs called opioid[s]," which are "sometimes called ... narcotic[s]." http://www.drugs.com/norco.html.

some household tasks was not determinative of disability) (citing <u>Smith v. Califano</u>, 637 F.2d 968, 971 (3d Cir. 1981) (disability claimant need not "vegetate in a dark room excluded from all forms of human and social activity")).

The Court finds that the ALJ's summary of plaintiff's daily activities mischaracterizes plaintiff's statements regarding those activities. While the ALJ concluded that plaintiff "continues to care for her personal hygiene" [AR at 17], plaintiff stated in the August 3, 2008, Function Report that she cannot bathe without help from her brother, shave her legs below her knees, or bend down to dress herself. The ALJ also noted that plaintiff "live[s] alone" [<u>id.</u>], but plaintiff testified that her nephew lives next door to her, and she represented in both her testimony and the Function Report that her brother, niece, and friend help her with cleaning her home. Next, the ALJ stated that a consultative examiner indicated that plaintiff "[is] able to drive to different places by herself." [<u>Id.</u>] However, plaintiff stated in her Function Report that she can only "drive close by," and that she asks her family to drive her when she needs to go "far away" [<u>see</u> AR at 137], and she testified that she only drives herself to the doctor when she does not have someone with her. [<u>See</u> AR at 33.] Next, while the ALJ stated that plaintiff "enjoys spending time with her family and is able to attend church" [AR at 17], plaintiff stated in the Function Report that she visits her mom only once a week, attends church only on Sundays, and has "lost many friends because [she] can no longer go out and party with them because of [her] illness." [AR at 138-39.] Finally, while the ALJ noted that plaintiff "goes to doctor appointments and runs errands" [AR at 17], plaintiff testified, as noted above, that she only drives herself to the doctor when she is not with someone else, and represented that she goes shopping with her nephew or with her friend. [<u>See</u> AR at 33, 138.] An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings. <u>See</u> <u>Reddick</u>, 157 F.3d at 722-23 (It is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports.").

The ALJ offered no legally adequate reason for discounting plaintiff's credibility. Remand is warranted on this issue.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate for the ALJ to properly consider the opinions of Dr. Ainbinder and Dr. Gumbs, and to properly evaluate plaintiff's credibility. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: August 7, 2012

/s/ Paul L. Abrams
_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE